# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

**DOUGLAS S. CARTER,**

**Plaintiff,**

**vs.**                                                    **Case No. 8:03-CV-326-T-27MAP**

**DIAMONDBACK GOLF CLUB, INC.,**

**Defendant.**

_____/

## ORDER

**BEFORE THE COURT** are Defendant's Motion for Summary Judgment Based Upon the Opinion of the Eleventh Circuit Court of Appeal (Dkt. 97) and Plaintiff's Response (Dkt. 100). Upon consideration, the Court having heard argument and being otherwise fully advised in the premises, Defendant's motion is granted in part and otherwise denied.

Plaintiff, a Jehovah Witness, alleges that Defendant, his former employer, discriminated against him by terminating him on the basis of his religion in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981a, and the Florida Civil Rights Act ("FCRA"), Chapter 760, Florida Statutes. (Dkt. 4). Defendant denies discriminating against Plaintiff and maintains that he was terminated for non-discriminatory performance related reasons. Plaintiff also contends that Defendant's termination decision included discriminatory and non-discriminatory reasons, or what is known as 'mixed motives', in violation of Title VII. Defendant contends that its termination decision would have been the same, even in the absence of any alleged discriminatory reasons. (Dkt. 21).

This court previously granted summary judgment in Defendant's favor. (Dkt. 21). The Eleventh Circuit vacated the order and remanded for consideration of Plaintiff's mixed-motive claim

in accordance with <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90 (2003).[1] The appellate court expressly agreed with this court that Plaintiff "has not shown direct evidence of discrimination". It found that Plaintiff "did present circumstantial evidence of a mixed motive on [Defendant's] part.

     Defendant has again moved for summary judgment, contending that Plaintiff's circumstantial evidence "does not rise to the level needed to survive summary judgment". (Dkt. 97, p. 2). Defendant alternatively seeks a partial summary judgment, contending that Plaintiff has not rebutted its "same decision" defense and that damages are accordingly limited. <u>Id.</u> Defendant seeks an order limiting "the case for trial on those limited damages issues", referring to a defendant's limited liability for damages (declaratory and injunctive relief, attorney's fees and costs) when it prevails on its "same decision" defense. Defendant's alternative motion is denied.

### Factual Background

     Plaintiff was hired to work for Defendant as an outside supervisor at Defendant's golf club in 1998. (Plaintiff's Depo. at 6). Plaintiff's duties included supervising the golf carts and the driving range and overseeing the outside activities at the golf club. <u>Id.</u> at 18, 21; (Dkt. 24, Deposition of Terry Ulrick (Mike) (hereinafter "Ulrick Depo.") at 89). Plaintiff's immediate supervisors were Shawn Camacho and Dante Battilla. <u>Id.</u> at 16. Lyle Beaver served as general manager of the golf club until January 2002, when Mike Ulrick became the general manager. Ulrich ultimately terminated Plaintiff. <u>Id.</u> at 18, 19, 27, 64.

*Plaintiff's Religion*

     According to Plaintiff, working at Defendant's golf club was "a good place for [his]

---

[1] Substantial portions of the previous Order on Defendant's Motion for Summary Judgment have been repeated as a matter of convenience, completeness and efficiency. No additional facts, discovery or affidavits have been submitted since that ruling.

religion." (Plaintiff's Depo. at 38). Plaintiff made his own schedule and arranged to have Thursday afternoons off to attend worship services. Id. at 43. He was also granted time off once a year to participate in assembly weekend from Thursday afternoon through Sunday. Id. at 45-46. During his employment with Defendant, on occasion he asked his co-workers and supervisors to "respect his beliefs" concerning Christmas parties, assembly weekend and telling dirty jokes. Id. at 44-47. If Christmas parties were held, he was not required to attend. Id. at 44.

Although Defendant's employees told dirty jokes, the jokes never disparaged Jehovah's Witnesses or the Jehovah Witness faith. (Plaintiff's Depo. at 46-53, 60). Dirty jokes were against Plaintiff's "belief of cleanness" since he has "a belief that you should not be doing those kind of filthy things, and you don't have those kind of filthy things in your mind." Id. at 52. Plaintiff admits that none of the jokes had anything to do with Jehovah's Witnesses and none were directed towards him. Id. at 50, 52, 60. On one occasion, when Plaintiff told Ulrick, "Michael, you know better. You shouldn't say something like that. My goodness, you can get in trouble for that",[2] Ulrick told Plaintiff "You Jehovah's can't take a joke." Id. at 47. On another occasion, before Ulrick became general manager, he said "All you Jehovahs think your morals are better than anyone else." Id. at 133.

### Complaints Regarding Plaintiff's Work Performance

During his tenure with Defendant, customers of the golf club complained about Plaintiff's attitude and behavior. Some of those complaints actually led to Plaintiff being terminated by then general manager Beaver in 2001. (Plaintiff's Depo. at 76-86). Plaintiff was re-hired after he and

---

[2] Although Ulrick denies saying that "Jehovah's can't take a joke" (Ulrick Depo. at 83), for purposes of summary judgment, it will be considered to have been said.

Beaver discussed Plaintiff's performance and Plaintiff agreed to "work on it real hard."[3] Id. at 83-84.

As an outside supervisor, Plaintiff supervised the outside employees and activities, including the golf carts and golf range. (Plaintiff's Depo. at 18); (Ulrick Depo. at 89). Plaintiff also kept track of employees' time when he asked them to work after they had clocked out. (Plaintiff's Depo. at 92-93). On one occasion, within a couple of weeks of his termination, Plaintiff clocked in his son Derrick before his son actually arrived at work. Id. at 94, 101. Plaintiff admits he clocked in his son but contends his son was owed time, although he also admits that his son told him later the same day that he wasn't owed any time. Id. at 94, 135.

Plaintiff ultimately crossed out the punched-in time and hand wrote "6:15 a.m.", the time Derrick allegedly arrived at work. Id. at 135. A co-worker, Dante Batilla, brought this to Ulrick's attention. (Ulrick Depo. at 68). At 8:00 a.m., Ulrick looked at Derrick's time card and noted that he had been clocked in, although he had not seen Derrick at work. When Ulrick confronted Plaintiff, Plaintiff said that his son had gotten lost. Id. at 68, 71.[4]

*Termination*

Ulrick terminated Plaintiff on March 1, 2002. Id. at 24. Ulrick called Plaintiff into his office and immediately told him that he was going to terminate him and that the decision was final. Id. at

---

[3] Plaintiff admits that he was "over aggressive" and cleaned customers' golf clubs even when they asked him not to do so. (Ulrick Depo. at 83-84). A customer had complained to Plaintiff that he had an attitude when the customer believed that Plaintiff was talking about him. (Plaintiff's Depo. at 77-79). Another customer complained after Plaintiff repeatedly asked him and his group to "pick it up" and "get this thing moving" when they were holding up other players on the golf course. Id. at 80-82. According to Plaintiff, it was a "big incident." Id. at 82. Beaver had explained to him that the customer is always right and had given the customers a free meal and another round of golf. Id.

[4] Ulrick reprimanded Plaintiff and admonished him that he could not do that. (Ulrick Depo. at 68, 71). Ulrick testified that he "didn't make a big, big deal out of it" at the time because he had " a lot of bigger deals that were working" and he wanted to "at least get through the season" before dealing with situations on a "one-on-one" basis. Id. at 74-75. Plaintiff denies that Ulrick told him not to clock in employees before they arrived at work.(Plaintiff's Depo. at 102).

104. Ulrick told Plaintiff, "You are a good worker" . . . "But it has to do with your greediness for the tips and the way you are interacting with the people."[5, 6]  Id. at 105.

Ulrick based his decision on two conversations he had with Plaintiff and one conversation he had with another employee.[7]  He also considered Plaintiff's attitude[8] and the time card incident.

_____

[5] Ulrick completed a Personnel Change Notice form which stated:

> Reason for Termination (if involuntary, state specific reasons/ instances for termination) customer complaints, continuous outside dealings, pocketing money with golfers, punching son in 1 hr. before he arrives, degrading people who don't tip. (Plaintiff's Depo. Ex. B)

[6] Another consideration in Ulrick's decision to terminate Plaintiff was that Plaintiff allegedly accepted money from customers to play additional rounds of golf. (Ulrick Depo. at 46, 96).

[7] In the first conversation, Ulrick told Plaintiff to "stop messing with the starters and the rangers." Id. at 54-55. "It was me talking to my employee that I don't like it and stop doing it. That's - - I don't know if you call it a verbal reprimand. I don't really jump on people and holler and scream. I just talk." Id. at 56. The responsibilities for rangers and starters were coordinated from the inside rather than the outside. Id.

The second conversation took place a few days later. (Ulrick Depo. 57). Plaintiff told Ulrick that he was out on the course because people weren't finishing their round within the time they were supposed to. Id. Ulrick told him he "should not be out there, that's why we have rangers, and to leave it alone. And prior to that, I just had a ranger quit. And he came to me and said he quit because of Doug, because Doug was jumping all over him about not taking care of the people out there." Id. "I reminded [Plaintiff] that he did not handle the starters and the rangers and he should not be out there, and we need to check the times on these things before we do anything about it." Id. at 59. The group of golfers Plaintiff admonished about their pace was actually within the four and a half hours allotted. Id.

The third conversation that led to Plaintiff's termination was between Ulrick and Gerry Simon, a starter, discussed infra. Id. at 62.

[8] According to Ulrick, Plaintiff had a bad attitude

> if he couldn't get a tip. And I felt that, you know, he was making a good salary out there, and the motivation should not be for the tips, it should be for taking care of the customers. That's why we have that group.
>
> I pay $5,000 a month out there. I pay more out there than I pay inside. And the whole purpose of it is to greet the people coming in the door, and to treat them professionally and courteously.

(Ulrick Depo. at 54, 104-07). He told Plaintiff that he had been thinking about it for "quite a while" and that "some of the owners don't like you." Id. at 36, 37. According to Ulrick, one of the owners of the golf club told him that Plaintiff is a "greedy SB" and that Plaintiff cleans his clubs and sits and acts "like [the owner] has to give [Plaintiff] money." Id. Plaintiff testified that during the termination meeting, Ulrick praised Plaintiff's job performance but on several occasions said, "Doug, you really need to find another place to work conducive to your religion." Id. at 38. Plaintiff told Ulrick that Diamondback was a good place for his religion. (Plaintiff's Depo. at 38). Ulrick denies making any statement about Plaintiff being a Jehovah's Witness or that Plaintiff needed to find a job more conducive to his religion. Id. at 108.

According to Ulrick, he had received numerous complaints over the course of a week regarding Plaintiff's job performance by Plaintiff's own co-workers. (Ulrick Depo. at 64). Plaintiff's co-workers complained to Ulrick about Plaintiff's interference with the responsibilities of the starters and rangers, which were not within Plaintiff's areas of supervision. Id. at 54-64. One ranger resigned because of Plaintiff's interference with his responsibilities. Id. at 60. Another employee, Gerry Simon, went to Ulrick's home one evening to complain about Plaintiff Id. at 63. Simon was "very upset", "livid"about Plaintiff's interference with the starters' work responsibilities and complained that "Doug is interfering with everything, and he won't stop." Id. at 63. Ulrick told Simon that he had already talked to Plaintiff a couple of times and that he would take care of

---

> And 75 percent of the time, that's the way it was. But that 25 percent was just eating a hole in me, because you get one shot at these people. And by the time they get in to me, if it's ruined, its too late. And that's why - - I mean, it was nothing - - again to me, it was nothing personal. Doug's character, you take away the tip money, he's a nice man, a great man.

(Ulrick's Depo. at 107).

it. Id. at 63-64.

The day after hearing Simon's complaints, Ulrick terminated Plaintiff. Id. at 64-65. Ulrick said to himself that he was the "new man on the block here, we are too busy, I don't have time for all this crap." Id. at 64. He had worked with Plaintiff for over a year and had observed Plaintiff's performance and conduct at work. Id. at 63. He terminated Plaintiff because of a "combination of stuff." Id. at 117. When Plaintiff "was working, if it was really a tense situation out there, [Plaintiff] would get a little hyper, get a little carried away, and get a little verbal every now and then." Id. at 65. Plaintiff would be "huffy" or "a little nasty to some of the customers" when situations were tense. Id. at 65, 79. Although Ulrick respected Plaintiff, he did not have time to work "one-on one" with Plaintiff and keep him there since they were "right in the heart of the season." Id. at 64-65.

## **Applicable Standards**

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The Court must view all evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party. Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970); Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1285 (11th Cir.1997). Judgment in favor of a party is proper where there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party on the issue before the Court. Fed. R. Civ. P. 56.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and

admissions on file, and designate specific facts showing that there is a genuine issue for trial. Celotex, 477 U.S. at 324.   The evidence must be significantly probative to support the claims. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

### Discussion

The integral factual inquiry is whether the defendant intentionally discriminated against the plaintiff. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255 (1981); Green v. Sch. Bd. of Hillsborough County, Fla., 25 F.3d 974, 978 (11th Cir. 1994).  The plaintiff continuously bears the burden of proving intentional discrimination by a preponderance of the evidence.  McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990). The standards for establishing intentional discrimination in lawsuits under Section 1981, the FCRA and Title VII are the same.  Brown v. Am. Honda, 939 F.2d 946, 949 (11th Cir. 1991); Standard v. ABEL Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998); Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1387 (11th Cir. 1998); Bass v. Bd. of County Comm'rs of Orange County, 38 F. Supp. 2d 1001 (M.D. Fla. 1999).   Accordingly, Plaintiff must establish, by a preponderance of the evidence, a *prima facie* case of intentional discrimination as to all of his claims.

A plaintiff may prove a claim of discrimination through direct or through circumstantial evidence. As this court and the Eleventh Circuit found, Plaintiff has presented no direct evidence in support of his Title VII claim.[9] Plaintiff must necessarily, therefore, rely on circumstantial evidence

---

[9] As this court's earlier order granting summary judgment was vacated, this court again concludes that there are no genuine issues of material fact as to Plaintiff's claim of discrimination, based on direct evidence. "Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [religion] . . . constitute direct evidence of discrimination."  Bass v. Board of County Comm'rs, 256 F.3d 1095, 1105 (11th Cir. 2001); Scott v. Suncoast Beverage Sales, Ltd., 295 F.3d 1223, 1227 (11th Cir. 2002); Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1359

of a mixed motive on Defendant's part when Ulrick terminated Plaintiff.

## Circumstantial Evidence of Discrimination

A plaintiff making a mixed-motive claim of discrimination need not present direct evidence of discrimination to establish a prima facie case. <u>Desert Palace</u>, 539 U.S. at 99. A plaintiff need only "demonstrate" by circumstantial evidence that "an employer used a forbidden consideration" with respect to the decision. <u>Id.</u> at 98. Here, as the Eleventh Circuit determined, Plaintiff has presented circumstantial evidence of a mixed motive when Ulrick terminated him.

## Modified <u>McDonnell Douglas</u> Approach

Ordinarily, a plaintiff seeking to prove discriminatory termination by circumstantial evidence must first demonstrate a *prima facie* case of discrimination. <u>McDonnell Douglas Corp.</u>, 411 U.S. at 802. The burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the termination. <u>Id.</u> If the defendant meets its burden, the plaintiff must then offer sufficient evidence to create a genuine issue of material fact that the defendant's reason is not true, but is rather a pretext for discrimination.

At least one court has applied what it characterized as a "modified <u>McDonnell Douglas</u> approach" to an ADEA mixed-motive case in which Plaintiff relied on circumstantial evidence to

---

(11th Cir.1999). "[R]emarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." <u>Bass</u>, 256 F.3d at 1105 (*quoting* <u>Standard v. A.B.E.L. Servs., Inc.</u>, 161 F.3d 1318, 1330 (11th Cir. 1998)).

As direct evidence of discrimination, Plaintiff points to statements Ulrick allegedly made referring to the Jehovah Witness faith. Accepting, for purposes of summary judgment, that Ulrick made the statements, they do not constitute remarks which evidence discrimination on the basis of religion. These statements are not blatant, derogatory, "pervasive and shocking" or characteristic of discriminatory animus. The statements, although insensitive and even offensive, did not refer to Plaintiff's religion in a derogatory manner.

prove discrimination. Essentially, that court concluded that when an employer articulates a legitimate non-discriminatory reason for an employment decision, the plaintiff must then offer sufficient evidence to create a genuine issue of material fact that either: (1) the defendant's reason is not true, but is rather a pretext for discrimination ("pretext alternative"); or (2) the defendant's reason, while true, was only one of the reasons for its conduct and another "motivating factor" was the plaintiff's protected characteristic ("mixed-motive alternative"). Rachid v. Jack in the Box, Inc., 376 F.3d 305, 312 (5th Cir. 2004) (quotations omitted).[10]

### Prima Facie Case of Discrimination

To establish a *prima facie* case of discriminatory termination, Plaintiff must prove by a preponderance of the evidence that he: (1) is a member of a protected class; (2) was qualified for the position held; (3) was discharged; and (4) was replaced by a person outside of the protected class or was discharged while a person outside of the class with equal or lesser qualifications was retained. Lee v. Russell Co. Bd. of Educ., 684 F.2d 769, 773 (11th Cir. 1982). Considering the evidence in the light most favorable to Plaintiff, has established a *prima facie* case of discrimination. He is a Jehovah's Witness, he was qualified for the outside supervisor position and was terminated. Additionally, he was replaced by a person outside of his religion, Skip Faupel. (Ulrick Depo. at 89).

### Reasons for the Termination

As Plaintiff has established a *prima facie* case of discrimination, the burden of production shifts to Defendant. Texas Dep't of Cmty. Affairs, 450 U.S. at 255. Defendant satisfies its burden

---

[10] In this Circuit, there is no indication that Desert Palace is believed to have overruled the application of McDonnell Douglas when a plaintiff relies on circumstantial evidence to establish a Title VII claim, even in a mixed motive case. See Cooper v. Southern Co., 390 F.3d 695, 725, n. 17 (11th Cir. 2004)("Moreover, the fact that the Court did not even mention McDonnell Douglas in Desert Palace makes us even more reluctant to believe that Desert Palace should be understood to overrule that seminal precedent.").

by articulating a legitimate, nondiscriminatory reason for terminating Plaintiff. Id.; Pritchard v. Southern Co. Servs., 92 F.3d 1130 (11th Cir. 1996); Weaver v. Casa Gallardo, Inc., 922 F.2d 1515, 1525 (11th Cir. 1991). As this burden is one of production, not persuasion, it "can involve no credibility assessment." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993). Here, Defendant has satisfied its burden by providing numerous legitimate, non-discriminatory reasons for terminating Plaintiff. Those reasons include complaints from Plaintiff's co-workers and customers about his conduct, Plaintiff's "greediness" for tips with the customers and owners and his "verbal," "huffy" and "nasty" attitude towards customers.[11] These reasons are buttressed by Plaintiff's termination in 2001 because of similar complaints. (Plaintiff's Depo. at 76-86).

### Pre-Text Claim

Since Defendant has met its "exceedingly light" burden of producing sufficient evidence to support a nondiscriminatory explanation for its decision, Plaintiff must prove that Defendant's proffered reasons were false and are actually a disguise for intentional discrimination. St. Mary's Honor Ctr., 509 U.S. at 507-508. To avoid summary judgment, Plaintiff must produce sufficient evidence for a reasonable fact finder to conclude that "each of the employer's proffered nondiscriminatory reasons is pretextual." Chapman v. AI Transp., 229 F.3d 1012, 1037 (11th Cir. 2000); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000). "A plaintiff is not

---

[11] As discussed, the record includes other evidence of Plaintiff's alleged misconduct at work. That evidence includes Plaintiff's clocking in his son in at work prior to the time he actually arrived, taking food from a catering truck that was intended for Chi Chi Rodriguez and his crew that were using Defendant's property to make a commercial, joining in the buffet line that was intended for the Polk County Sheriff's Department before the customers had been served, soliciting customers to play golf at Mystic Dunes while they were on Defendant's golf course, stealing property from Defendant and selling beer to Defendant's customers. Ulrick, however, testified in his deposition that although much of this conduct was alleged to have occurred, Plaintiff was not specifically terminated because of these reasons. Some of the incidents either occurred before he became general manager, were resolved to his satisfaction or were learned of after the termination. (Dkt. 24, Ulrick Depo.).

allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." Chapman, 229 F.3d at 1030.

Plaintiff has failed to meet Defendant's reasons "head on" and rebut them. Rather, Plaintiff merely recasts the reasons and argues inconsistencies. In an effort to show that Ulrick's reasons for terminating him were false, Plaintiff takes issue with the reasons Ulrick gave for his termination. Regardless of whether Defendant's reasons for terminating Plaintiff were good, bad, right or wrong, an employer may terminate an employee for "a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." Nix v. WLCY Radio/Rahall Commc'ns., 738 F.2d 1181, 1178 (11th Cir. 1984).

Defendant provided a number of reasons for terminating Plaintiff. They are not inconsistent. First, Ulrick explained that he received numerous complaints about Plaintiff's interference with the responsibilities of the starters and rangers. Plaintiff did not rebut this and has provided no evidence that this reason was false. Second, Ulrick testified that he received complaints from owners and customers about Plaintiff's behavior and "greediness" for tips. Plaintiff admits that he was overly aggressive and has failed to introduce evidence that this reason is untrue or should be disbelieved. Third Plaintiff was terminated because he was rude to customers. Plaintiff has not refuted this. Nothing in the record establishes the falsity of Defendant's nondiscriminatory reasons for terminating Plaintiff. Accordingly, Plaintiff has not established that Defendant's reasons for terminating him are pretextual.

### Mixed-Motive Claim

To establish a mixed-motive claim, a plaintiff may show through circumstantial evidence that

unlawful discrimination was a motivating factor in the adverse employment decision.[12]  <u>Desert Palace</u>, 539 U.S. at 101; 42 U.S.C. § 2000e-2(m).  Here, as discussed, Defendant has articulated legitimate, non-discriminatory reasons for Plaintiff's termination which have not been shown to be untrue or pretextual. Plaintiff must accordingly offer sufficient evidence to create a genuine issue of material fact as to whether another "motivating factor" was Plaintiff's religion. <u>Rachid</u>, 376 F.3d at 312 (quotations omitted). Applying <u>McDonnell Douglas</u> to the facts of this case, Plaintiff has, even in the face of Defendant's un-rebutted legitimate non-discriminatory reasons, offered sufficient circumstantial evidence to create a genuine issue of material fact as to whether his religion was a motivating factor in his termination.

An employer's discriminatory comments that relate to job performance and a protected characteristic may reasonably be found to establish that the protected characteristic "played a role" in the decision to terminate. <u>Rachid</u>, 376 F.3d at 315. Even indirect comments about a protected characteristic may be probative of unlawful discriminatory intent. <u>Bienkowski v. Am. Airlines, Inc.</u>, 851 F.2d 1503, 1507 (5th Cir. 1988). The frequency and timing of the comments in relation to the adverse employment decision are relevant in determining discriminatory motivation. <u>Rachid</u>, 376 F.3d at 315-316.

Ulrick's statement during the termination meeting that Plaintiff needed "to find another place to work conducive to [his] religion" establishes circumstantially that religion may have played a role in the termination.[13]  (Plaintiff's Depo. at 38). That Ulrick's statement was made *during* the

---

[12] 42 U.S.C. § 2000e-2(m) provides: "An unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."

[13] Plaintiff argues that Ulrick's "general disdain for Jehovah's Witnesses and their beliefs" and his "pattern of ... terminating Jehovah's Witnesses and replacing them with non-Jehovah's Witnesses" establishes that religion was a motivating factor in Plaintiff's termination. (Dkt. 100, p. 17). There is no

termination meeting is significant.  Indeed, the timing of the statement alone could suggest that religion was a motivating factor in Ulrick's decision, particularly when considered with Ulrick's previous comments regarding Plaintiff's religion.[14]  This circumstantial evidence is sufficient to raise a genuine issue of material fact which precludes summary judgment on Plaintiff's claim.  It will be for the jury to determine whether legitimate and illegitimate reasons motivated Ulrick when he terminated Plaintiff. If Plaintiff establishes to the jury's satisfaction that religion was "a motivating factor" in that decision, the jury will address Defendant's "same decision" affirmative defense.[15]

_____

evidence in the record to support this argument, however. Plaintiff acknowledges that Defendant employs four or five other Jehovah's Witnesses. (Plaintiff's Depo. at 55-56).

[14] According to Plaintiff, Ulrick told Plaintiff that "You Jehovahs can't take a joke"; and "All you Jehovahs think your morals are better than anyone else." (Plaintiff's Depo. at 47, 133). Although these statements are arguably offensive, none of them, without more, could reasonably support a conclusion that religion was a motivating factor in Plaintiff's termination, given the other complaints about Plaintiff's job performance.  See Oncale v. Sundowner Offshore Servs., Inc., 423 U.S. 75 (1998) (Title VII is not a federal "civility code");  Mendoza v. Borden, Inc., 195 F.3d 1238 (11th Cir. 1999) ("Title VII was never intended to protect employees from all unpleasant and rude conduct in the workplace").  These statements were not repeatedly made, were temporally remote from Plaintiff's termination and were unrelated to Plaintiff's job performance.  Compare Rachid v. Jack in the Box, Inc., 376 F.3d 305 (5th Cir. 2004), where ageist comments were "continually" and "repeatedly" made and were related to the plaintiff's job performance and employment.

[15] If Plaintiff convinces the jury that his religion was a motivating factor in the decision to terminate him, the jury will then address Defendant's "same decision" affirmative defense. If the jury finds in favor of Defendant on that defense, that "does not absolve it from liability, but restricts the remedies available to plaintiff." Desert Palace, 539 U.S. at 94. A successful "same decision" defense limits a plaintiff's remedies to declaratory and injunctive relief, and attorney's fees and costs "demonstrated to be directly attributable only to the pursuit of" a mixed motive claim. See Rachid, 376 F.3d at 312; Desert Palace, 539 U.S. at 94-95; 42 U.S.C. § 2000e-5(g)(2)(B). Stanley v. City of Dalton, Ga., 219 F.3d 1280 (11th Cir. 2000), relied on by Defendant, is inapposite. In a § 1983 action, a successful "same decision" defense does absolve a defendant from liability. Harris v. Shelby County Bd. of Educ., 99 F.3d 1078, 1084, n.5 (11th Cir. 1996) In a Title VII case, however, the defense limits the relief available to a plaintiff. Id. at 1084-85.

Here, if Defendant is successful on its "same decision" defense, Plaintiff's remedies will be limited to attorney's fees and costs.  Plaintiff did not request declaratory or injunctive relief in the Amended Complaint.  Plaintiff's relief is therefore limited to attorney's fees and costs "demonstrated to be directly attributable only to the pursuit of" his mixed-motive claim pursuant to 42 U.S.C. §§ 2000e-2(m) and 2000e-5(g)(2)(B).

In the Amended Complaint, Plaintiff's prayer for relief requests "back pay, front pay in lieu of

Accordingly, Defendant's Motion for Summary Judgment Based Upon the Opinion of the Eleventh Circuit Court of Appeal (Dkt. 97) is **GRANTED IN PART and DENIED IN PART**. Summary Judgment is granted as to all claims except Plaintiff's mixed-motive claim.

**DONE AND ORDERED** in chambers this $\underline{31}^{\text{st}}$ day of January, 2006.

_____
**JAMES D. WHITTEMORE**
**United States District Judge**

*Copies to: Counsel of Record*

---

reinstatement, compensatory damages, prejudgment interest, punitive damages, attorney's fees, costs of this action, and such other relief as this Court deems just and proper." (Dkt. 4, pp. 7-8). During oral argument, Plaintiff's counsel argued that they have requested injunctive and/or declaratory relief based on the request for "such other relief as this Court deems just and proper." However, Plaintiff's Complaint was filed nearly three (3) years ago and until the hearing, Plaintiff made no mention or request for equitable or declaratory relief. For this reason, the "other relief" clause in the Amended Complaint will not be construed as encompassing claims for injunctive or declaratory relief.

15